UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HELFERICH PATENT LICENSING, LLC, | ) | |
| | ) | Case No. 10-cv-4387 |
| Plaintiff, | ) | Case No. 11-cv-7395 |
| v. | ) | Case No. 11-cv-7607 |
| | ) | Case No. 11-cv-7647 |
| THE NEW YORK TIMES COMPANY; | ) | Case No. 11-cv-9143 |
| G4 MEDIA, LLC; | ) | |
| CBS CORPORATION; | ) | Judge John W. Darrah |
| BRAVO MEDIA, LLC; | ) | |
| J.C. PENNEY CORPORATION, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Helferich Patent Licensing, LLC ("HPL"), filed suit against Defendants, The New York Times Company ("NYT"); G4 Media, LLC ("G4"); CBS Corporation ("CBS"); Bravo Media, LLC ("Bravo"); and J.C. Penney Corporation, Inc. ("J.C. Penney"), alleging claims of patent infringement. The parties filed cross-motions for summary judgment on the issue of patent exhaustion, which have been fully briefed. Defendants jointly move for summary judgment on the basis that the patents asserted by HPL are exhausted as to HPL's infringement claims; HPL concurrently moves for summary judgment on the basis that Defendants are not entitled to the defense of patent exhaustion.

**BACKGROUND**

HPL holds a large portfolio of patents; it enforces its patent rights with licensing or through litigation. The patents at issue relate to the methods and systems that send and receive hyperlinks to websites to an electronic device, such as a cellular phone. Using Short Message Service ("SMS") or Multimedia Messaging Service ("MMS") protocols, a cell phone can receive

a link to a website from a content provider. A cell phone user can then click on the link sent to the phone to retrieve the content found at a website.

HPL has licensed this technology to cell phone manufacturers, so that any handheld device sold can receive such content without being accused of infringing HPL's patents. Many content providers have also entered into license agreements with HPL, so that they may send their content to a cell phone. Defendants in this case did not enter into license agreements with HPL. Instead, Defendants contend that the patents at issue are exhausted, based on HPL's licensing agreements with cell phone and handset manufacturers.

The parties have submitted statements of material facts pursuant to Local Rule 56.1.[1] The following facts are taken from the parties' statements of undisputed material facts submitted in accordance with Local Rule 56.1.[2,3] HPL is a limited liability company, organized under the

---

[1] Local Rule 56.1(a)(3) requires a party moving for summary judgment to provide "a statement of material facts as to which the moving party contends there is no genuine issue . . . ." Local Rule 56.1(b)(3) requires the nonmoving party to admit or deny each factual statement proffered by the moving party and concisely designate any material facts that establish a genuine dispute for trial. A litigant's failure to dispute the facts set forth in an opponent's statement in the manner dictated by Local Rule 56.1 results in those facts' being deemed admitted for summary judgment purposes. Local Rule 56.1(b)(3) further permits the non-movant to submit additional statements of material facts that "require the denial of summary judgment . . . ."

To the extent that a response to a statement of material fact provides only extraneous or argumentative information, this response will not constitute a proper denial of the fact, and the fact is admitted. *See Graziano v. Village of Oak Park*, 401 F. Supp. 2d 918, 937 (N.D. Ill. 2005). Similarly, to the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, including a fact which relies upon inadmissible hearsay, such a fact is disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997).

[2] Plaintiff also attempts to designate certain statements and arguments in Defendants' brief in support of their motion as Defendants' Statements of Material Facts, and then provide responses to these statements and arguments. Plaintiff's approach goes beyond the scope of Local Rule 56.1; these statements are not properly identified as statements of material facts for purposes of Local Rule 56.1 and will not be regarded as such, nor will Plaintiff's responses be considered.

laws of the state of Illinois, with its principal place of business in Phoenix, Arizona. (Pl.'s SOF ¶ 2.) HPL holds a patent portfolio which includes more than fifty patents, including the patents-at-issue, relating to mobile communication devices and the provision of media and content to such devices. (Pl.'s SOF ¶ 2.) HPL is the exclusive licensee of the patents-in-suit. (Defs.' SOF ¶ 7.)

NYT is a New York corporation and Bravo is a New York limited liability company, both with their principal places of business in New York, New York. (Defs.' SOF ¶¶ 2, 5; Pl.'s SOF ¶¶ 3, 6.) CBS and J.C. Penney are both Delaware corporations, with principal places of business in New York, New York, and Plano, Texas, respectively. (Defs.' SOF ¶¶ 4, 6; Pl.'s SOF ¶¶ 5,7.) G4 is a Delaware limited liability company, with its principal place of business in Los Angeles, California. (Defs.' SOF ¶ 3; Pl.'s SOF ¶ 4.) Subject-matter jurisdiction exists pursuant to 28 U.S.C. §§ 1331, 1338(a) and 2202, and venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and 1400(b). (Defs.' SOF ¶¶ 8-9; Pl.'s SOF ¶¶ 8-9.)

There are six patents-in-suit: U.S. Patent No. 7,280,838, issued on October 9, 2007; U.S Patent No. 7,499,716, issued on March 3, 2009; U.S. Patent No. 7,835,757, issued on November 16, 2010; U.S. Patent No. 8,107,601, issued on January 31, 2012; U.S. Patent No. 8,116,741, issued on February 14, 2012; and U.S. Patent No. 8,134,450, issued on March 13, 2012. (Third Am. Compl. ¶¶ 6-11.)

The entire cellular handset manufacturing industry has acquired licenses under the HPL portfolio. (Defs.' SOF ¶ 11.) All the licenses at issue here provide for certain releases (subject to some limitations); the licenses to each handset manufacturer generally provide that:

---

[3] Admitted Statements of Material Facts by Defendants are designated as "Defs.' SOF," with the corresponding paragraph referenced; Plaintiff's Additional Admitted Statements of Material Facts are designated as "Pl.'s SOF," with the corresponding paragraph referenced.

> HPL hereby releases, acquits and discharges Licensee's respective direct and indirect past, present and future customers, retailers, wholesalers, distributors, dealers, resellers, users, OEMs, vendors and manufacturers from and against any and all claims, demands, liabilities and rights of action of any kind of nature, at law, in equity, or otherwise, known and unknown, suspected and unsuspected, disclosed and undisclosed, relating to any infringement or alleged infringement of any of the Licensed Patents and Applications (whether direct, contributory or by inducement, and whether or not willful), but only to the extent that such claim, demand, liability or right of action arises from the manufacture, use, sale, offer for sale, import or export by or for Licensee of a product within the Licensed Fields.

(Defs.' SOF ¶ 12; Defs.' SOF Ex. BB § 2(b).) HPL's license agreements also have provisions relating to a "Covenant Not to Sue," which provides that, subject to exceptions:

> HPL hereby covenants and agrees with Licensee that neither HPL nor any person or entity directly or indirectly controlled by it or claiming through it will bring suit or otherwise assert **any claim or cause of action . . . against a Third Party (including, without limitation, Wireless Service Providers, Wireless Service Message Providers, Wireless Content Providers and Consumers) for an infringement claim** that is dependent upon such Third Party making, importing, exporting, selling or offering for sale to Consumers a Mobile Wireless Communication Device within the scope of the Licensed Fields . . . .

(Defs.' SOF ¶ 13; Defs.' SOF Ex. BB § 3(b) (emphasis added and to be discussed further, below.) One Licensed Field includes "Mobile Wireless Communication Devices that are made, used, imported, offered for sale, sold or otherwise disposed of by Licensee, anywhere in the world." (Pl.'s SOF ¶ 57.) Another Licensed Field, incorporated in some of the license agreements, includes "Mobile Wireless Content Provision carried out by or for Licensee." (Defs.' SOF Ex. B § 1g(1).) Some of these license agreements indicate that the "licensed patents and applications" at issue include:

> [A]ll the patents and applications owned or controlled by, or exclusively licensed to, HPL including but not limited to those identified on Exhibit A, including any continuations, continuations-in-part, divisionals, extension, reissues, or reexaminations thereof, renewals and extensions thereof, any patent or application to which those listed in Exhibit A claim priority, in whole or in part, and any foreign counterparts claiming priority or issuing from any of the above.

4

(Defs.' Add'l. SOF ¶ 14; Defs.' Ex. B at §1(h).)  However, some of the license agreements also specifically withhold certain *claims* against third parties.  These license agreements attach a separate exhibit, separately identify claims from HPL's patents that are not covered by the license agreement and, therefore, in HPL's view, reserving its rights to enforce these specific claims against other parties.

In U.S. Patent No. 8,134,450, the Field of Invention states:  "the present invention relates generally to paging transceivers and methods for selectively acting on messages and, more particularly, to paging transceivers and methods for selectively retrieving messages."  (Defs.' Add'l. SOF ¶ 15.)  The properties and activities of handsets (also called paging transceivers, pager transceivers, and paging receivers) are discussed in the portions of the '450 Patent that describe the field of the invention, the background of the invention, and the summary of the invention. (Defs.' Add'l. SOF ¶ 16.)  The other patents-in-suit similarly discuss the properties of, and activities performed by, handsets.  (Defs.' Add'l. SOF ¶ 17.)  Each of the patents asserted in this suit provides for an operation to be performed by a content provider, directed to a mobile phone.  (Defs.' SOF ¶ 14; Pl.'s Resp. to Defs.' SOF ¶ 14.)  HPL has sent notice letters to at least 121 companies that have subsequently agreed to take a content license.  (Defs.' SOF ¶ 22.)  HPL has admitted to the PTO that it granted content licenses to several handset manufacturers, as well.  (Defs.' SOF ¶ 23.)

## LEGAL STANDARD

Patent exhaustion is an affirmative defense to a claim of patent infringement. *ExcelStor Technology, Inc. v. Papst Licensing GMBH & Co. KG*, 541 F.3d 1373, 1376 (Fed. Cir. 2008). Accordingly, as a substantive patent issue, Federal Circuit law controls the issue of patent exhaustion; though, Seventh Circuit law governs procedural summary judgment issues, such as

5

the statement of material facts. *See U.S. Gypsum Co. v. LaFarge North America, Inc.*, 508 F. Supp. 2d 601, 611-12 (N.D. Ill. 2007).

Patent exhaustion is an issue that may be properly decided by summary judgment. *See Transcore v. Elec. Transaction Consultants*, 563 F.3d 1271, 1274 (Fed. Cir. 2009). Patent exhaustion requires that after a patented product is sold initially, all patent rights terminate in that product, provided the product sufficiently embodies, or "partially practice[s]" the patent. *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617, 625, 635 (2008). "The rationale underlying the doctrine rests upon the theory that an unconditional sale of a patented device exhausts the patentee's right to control the purchaser's use of that item thereafter because the patentee has bargained for and received the full value of the goods." *Multimedia Patent Trust v. Apple Inc.*, Case No. 10-cv-2618-H, 2012 WL 6863471, at *3 (S.D. Cal. Nov. 9, 2012) (citing *Princo Corp. v. ITC*, 616 F.3d 1318, 1328 (Fed. Cir. 2010) (en banc)). Much like claim construction, the issue of whether a product sufficiently embodies a patent such that the patent is exhausted is an issue of law and, therefore, appropriately addressed on summary judgment. *See Baychar, Inc. v. Salomon North America*, Case No. 04-136-B-C, 2006 WL 2061400, at *6 (D. Me. 2006) ("Whether the principle of patent exhaustion . . . should be recognized is a matter of law for the Court to decide.") (citation omitted).

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

In considering a motion for summary judgment, the court views the evidence in a light most favorable to the nonmoving party, drawing all reasonable inferences in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The court does not make credibility determinations or weigh conflicting evidence on summary judgment. *Anderson*, 477 U.S. at 255.

## ANALYSIS

"The longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item." *Quanta*, 553 U.S. at 625. "[T]he traditional bar on patent restrictions following the sale of an item applies when the item sufficiently embodies the patent – *even if it does not completely practice the patent* – such that its only and intended use is to be finished under the terms of the patent." *Id.* (explaining the holding in *United States v. Univis Lens Co.*, 316 U.S. 241, 249-51 (1942)) (emphasis added).

Defendants rely on the Supreme Court's ruling in *Quanta* to support their motion for summary judgment, arguing that when a patented invention is sold, all of the patent's claims are exhausted, regardless of any narrowly tailored license agreements. (Defs.' Mem. in Support of Mot. at 5-6.) In *Quanta*, LG Electronics ("LGE") purchased a portfolio of patents, including three patents that contemplated a system and methods for a computer to efficiently access data and transfer data between the microprocessor (which carries out the main functions of the computer system), and the other devices, like the computer keyboard and mouse. *Quanta*, 553 U.S. at 621-22. LGE licensed its patent portfolio to Intel Corporation, permitting Intel to

7

manufacture and sell microprocessors which use the LGE patents. *Id.* at 623. The agreement in *Quanta* between LGE and Intel contained some limitations, providing, in part, that Intel was required to give written notice to its customers that, while it had a broad license from LGE on the products purchased by its customers, "the license 'does not extend, expressly or by implication, to any product that you make by combining an Intel product with any non-Intel product.'" *Id.* at 623-24. Thereafter, Quanta purchased microprocessors from Intel and manufactured computers that combined Intel parts with non-Intel parts. *Id.* The Supreme Court held that the Intel products "constitute a material part of the patented invention and all but completely practice the patent," and further, that "[b]ecause Intel was authorized to sell its products to Quanta, the doctrine of patent exhaustion prevents LGE from further asserting its patent rights with respect to the patents substantially embodied by those products." *Id.* at 633, 637. The focus of *Quanta* is that the sale of the product results in the exhaustion of the *patent* in its entirety, rather than the exhaustion of certain *claims*.

However, HPL contends that its patents are distinguishable from those at issue in *Quanta*, as HPL's patented inventions include distinct "handset" claims and "content" claims. (Pl.'s Resp. at 3-4.) Essentially, HPL argues that the handset manufacturer companies which obtained licenses from HPL received licenses to practice only the *handset* claims. Defendants' activities do not infringe these handset claims but, instead, purportedly infringe HPL's *content* claims, which were not licensed to the handset manufacturer companies. Defendants counter that a patentee cannot use a license agreement to carve up a patent, claim by claim, in order to receive multiple royalties. A claim in a patent can only be carved out if it becomes the subject of a separate, distinct patent, relying on the Supreme Court's holding that the elements of a patent claim cannot be parceled out – "[f]or if anything is settled in the patent law, it is that the

combination patent covers only the totality of the elements in the claim and that no element, separately viewed, is within the grant." *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 344 (1961).

*Licensing of All Handsets Requires Exhaustion*

No genuine issue of material fact exists with respect to HPL's licensing of its portfolio to all handset manufacturers, as HPL asserted to the PTO that "[i]n about four years, the ***entire*** cellular handset industry – 28 of the world's most aggressive companies – acquired licenses under the [HPL] portfolio." (Defs.' SOF ¶ 11, Ex. CC at 33-34) (emphasis in original). In these licenses between HPL and the handset manufacturers, the handset manufacturers are permitted, only within the described Licensed Fields, to practice, without limitation, any and all inventions claimed in the Licensed Patents, subject to restrictions, which vary between License Agreements.

HPL contends it "carefully licensed the materially different content and handset claims to the respective infringers in the respective fields." (Pl.'s Resp. to Mot. at 6.) It is apparent that HPL sought to carefully construct some of its Licensing Agreements in such a way that it could recover multiple royalties on the same patents from a single sale or use. [4]

By HPL's own admission, every cellular handset manufacturer has licensed its portfolio. Now, HPL seeks to recover royalties beyond the handset manufacturers and recover additional

---

[4] However, provisions regarding these reserved claims across the License Agreements is inconsistent. For example, some of the License Agreements indicate that the Licensed Patents include *all* patents and patent applications assigned to, owned by, or controlled by HPL; however, other license agreements define the Licensed Patents as *only* the patents listed on an exhibit attached to that specific license agreement. (*See* Defs.' SOF Exs. B-D.) Still others name the Licensed Patents as only the patents listed on an exhibit attached to the agreement, but further provide that HPL did not own any patents outside those listed. (Defs.' SOF Ex. E.) Additionally, the License Agreements are inconsistent in their reservation of claims; some License Agreements specifically identify each claim covered by the license, while others are much more vague.

9

royalties from downstream third parties. However, HPL cannot avoid patent exhaustion by attempting to shield some of the claims within the patents-in-suit from being covered by Licensing Agreements. "[O]nce lawfully made and sold, there is no restriction on [the product's] *use* to be implied for the benefit of the patentee or his assignees or licensees." *Adams v. Burke*, 84 U.S. 453, 457 (1873) (emphasis in original). Once HPL licensed its patent portfolio to, for example, Motorola, downstream consumers and third-party users of Motorola devices employing HPL's patents cannot be found to be infringing. *See Quanta*, 553 U.S. at 630 (rejecting LGE's argument that method claims are never exhausted and explaining that, on LGE's rejected theory, despite issuing licenses to some parties, "any downstream purchasers of the system could nonetheless be liable for patent infringement.").

All of the patents-at-issue require the use of a handset device. (Third Am. Compl. ¶ 12; Defs.' SOF ¶ 14.) HPL licensed its patents to every handset manufacturer. Accordingly, no genuine issue of material fact exists that every handset device has been licensed to practice HPL's patents; ergo, no handset device can infringe HPL's patents.

*Sufficient Embodiment*

Patent exhaustion bars further restrictions on a patent once an item is sold which sufficiently embodies a patent – "even if it does not completely practice the patent – such that its only and intended use is to be finished under the terms of the patent." *Quanta*, 553 U.S. at 628. Here, there is no genuine issue of material fact that the handset devices sold sufficiently embody the patents-in-suit.

The handset devices have the capability to receive content from content providers, and the patents all require devices capable of receiving content or messages. *See, e.g.*, U.S. Patent No. '241 Abstract (explaining that the handset device receives a "page and alerts the user that a

message is waiting and preferably provides a short description of the message. The user can then download or otherwise act on the message . . . . The messages stored by the systems and delivered to the [handset] may be of different types, such as voice, text, audio, or even video.") There would be little value to the handset manufacturers (or their end users) to have purchased licenses to HPL's patents to receive content from a third-party content provider if the content provider, like Defendants, could not send the message to the licensed handset device without infringing the patents. The handset devices are capable of receiving content, and they are permitted to receive content in the manners provided for by HPL's patents. Therefore, the products "embody the essential features of the [HPL] Patents because they carry out all the inventive processes when combined, according to their design, with standard components." *Quanta*, 553 U.S. at 634. No genuine issue of material fact exists that the handset devices at least partially practice, and therefore, sufficiently embody, HPL's patents. *See Quanta*, 553 U.S. at 635 ("The relevant consideration is whether the . . . Products that partially practice a patent – by, for example, embodying essential features – exhaust *that* patent.").

Exhaustion then turns on the handset manufacturers' licenses to sell the handset devices practicing HPL's patents. "The authorized sale of an article that substantially embodies a patent exhausts the patent holder's rights and prevents the patent holder from invoking patent law to control postsale use of the article." *Quanta*, 553 U.S. at 638. Once the handset manufacturers sell the handsets which embody HPL's patents, HPL's patents are exhausted as to all third parties, including Defendants.

*Covenants Not To Sue*

Each of HPL's License Agreements include Covenants Not to Sue, which provide that HPL agrees not to sue the licensee and third parties, including content providers and consumers,

for selling or using a device covered by the License Agreement. The License Agreements attempt to limit these Covenants by reserving causes of actions for infringement of "reserved claims."

"[A] product sold under a covenant not to sue constitutes an authorized sale under the patent exhaustion doctrine." *Bobel v. MaxLite, Inc.*, Case No. 12 C 5346, 2013 WL 142987, at *4 (N.D. Ill. Jan. 11, 2013) (citing *Transcore*, 563 F.3d at 1276). HPL's Covenants Not to Sue exhaust the rights under the patents despite HPL's efforts to limit the rights of third parties, like Defendants, while permitting end users to employ the technology without violating the patents. "[T]he parties' intent with respect to downstream customers is of no moment in a patent exhaustion analysis." *Transcore,* 563 F.3d at 1775 (citing *Quanta*, 553 U.S. at 637). The right of Defendants and other third parties here to practice HPL's patents is based exhaustion, not on an implied license from a covenant in other agreements. "And exhaustion turns only on [licensee's] own license to sell products practicing the [licensor's] Patents." *Quanta*, 553 U.S. at 637. HPL's attempt to create post-sale restrictions against third parties, including Defendants, in its Covenants Not to Sue fails, as it violates the basic principles of patent exhaustion.

HPL's Covenants Not to Sue essentially state that HPL agrees not to sue any third parties, except for any third party that may potentially infringe some of the claims in its patents. As discussed above, HPL cannot reserve claims from its patent license. However, even if this were not the case, some of its License Agreements fail to identify which specific claims are actually reserved. HPL's so-called "Withheld Claims" provision serves to almost entirely defeat the grant of the Covenant Not To Sue in each License Agreement, as emphasized above. This is precisely the sort of end-run around of patent exhaustion *Quanta* rejects. *Quanta*, 553 U.S. at 630.

## CONCLUSION

A single patent can contain many claims, as the patents at issue here. If HPL were permitted to license some claims but not others, the effect would be to vitiate the doctrine of patent exhaustion, which provides that the sale of a device which partially practices a patent *exhausts* that patent in its entirety. *Quanta*, 553 U.S. at 635. The reasoning in *Quanta*, as discussed above, is readily applicable here: once a licensee sells a mobile device that partially embodies HPL's patent, even if the device does not *completely* practice HPL's patent, that patent is exhausted. The doctrine of patent exhaustion governs the exhaustion of a *patent*, not the exhaustion of individual claims.

HPL's licensing model attempts to parcel out separate claims in a patent and recover royalties from each distinct claim within a patent. HPL's proposed rule would have an adverse impact on the licensees and third parties. A licensee would be uncertain as to what parts of a patent it has use rights and what is not licensed, as is likely the case with many of HPL's licensees, who entered into License Agreements that do not clearly name what claims are covered under the License Agreements. If these claims are separate and distinct within a single patent that a patentee seeks royalties on licenses for each individual claim, the patentee must file separate patents and then issue a license on each distinct patent. *See Aro*, 365 U.S. at 344-45 (addressing the issues of treating claim elements separately and providing: "Since none of the separate elements of the combination is claimed as the invention, none of them when dealt with separately is protected by patent monopoly.").

Moreover, if HPL were able to carve out individual claims from a single patent, it could potentially claim a multitude of separately licensable rights from one invention and thereby, in effect, create hundreds of patents out of a single patent. Here, HPL has licensed its patents to the

13

entire handset manufacturing industry and received a licensing fee from each handset manufacturer. If HPL were then permitted to prosecute every third party sending content to a licensed handset device for infringement, HPL would, by definition, receive multiple royalties for its previously licensed (and therefore, exhausted) patent. "Patentees . . . are entitled to but one royalty for a patented machine, and consequently when a patentee has . . . authorized another to construct and sell it, or to construct and use and operate it, and the consideration has been paid to him for the right, he has then to that extent parted with his monopoly, and ceased to have any interest whatever in the machine so sold or so authorized to be constructed and operated." *Bloomer v. Millinger*, 68 U.S. (1 Wall.) 340, 350 (1863). To permit a patentee to reserve specific claims from patent exhaustion would frustrate the purposes of the doctrine, including an efficient method of determining that a patent had been exhausted. To the contrary, the confusion that would be created by HPL's model would produce uncertainty regarding the rights of third parties and end users and potentially deter further innovation. "[T]he primary purpose of our patent laws is not the creation of private fortunes for the owners of patents but is 'to promote the progress of science and useful arts.'" *Quanta*, 553 U.S. at 626 (quoting *Motion Picture Patents Co. v. Universal Film Manufacturing Co.*, 243 U.S. 502, 511 (1917) and detailing the United States Supreme Court's history of ruling on patent exhaustion issues).

The doctrine of patent exhaustion is designed to avoid double recovery by a patentee, promote the orderly administration of patent rights, provide an efficient method for determining the termination of the patent monopoly, and promote fair competition. To permit HPL to recover multiple times on the same patent by selling licenses to the patents piece by piece (or claim by claim) is contradictory to these policies supporting the doctrine of patent exhaustion. Therefore, HPL's patents are exhausted.

Accordingly, Defendants' Motion for Summary Judgment on the issue of patent exhaustion is granted, and HPL's Motion for Summary Judgment is denied. Judgment is entered in favor of Defendants, and HPL's claims of patent infringement are dismissed.

Date: August 14, 2013

_____
JOHN W. DARRAH
United States District Court Judge